**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **BIOSONICS TECHNOLOGY, LLC**<br><br>**Plaintiff,**<br><br>vs.<br><br>**SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG ELECTRONICS AMERICA, INC.,**<br><br>**Defendants.** | **Civil Action No.**<br><br><br>**JURY TRIAL DEMANDED** |

## BIOSONICS' ORIGINAL COMPLAINT

Plaintiff, Biosonics Technology, LLC, (hereafter "Biosonics" or "Plaintiff") files this complaint for patent infringement against Defendants Samsung Electronics Co., Ltd. ("SEC") and Samsung Electronics America, Inc. ("SEA") (collectively "Defendants" or "Samsung"), and alleges as follows:

## NATURE OF ACTION

1.      This is a civil action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 *et seq*., including 35 U.S.C. § 271.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) in that this is a civil action arising out of the patent laws of the United States of America.

2.      Samsung has infringed and continues to infringe at least one claim of U.S. Patent Nos. 11,593,776; 12,314,915; 9,065,893;  and  9,122,966  (collectively the  "Asserted Patents").

3.      Samsung infringes directly, literally and/or by the doctrine of equivalents, contributes to the infringement of, and/or induces infringement of the Asserted Patents by making,

using, selling, offering for sale, and/or importing into the United States products that incorporate Biosonics' patented in-display fingerprint authentication technology.

4.    Biosonics seeks damages and other relief for Samsung's infringement of the Biosonics' patented technology

## PARTIES

5.    Plaintiff Biosonics is a limited liability company organized and existing under the laws of the State of Texas, with a principal place of business at 101 E. Park Blvd, Suite 600 Plano, TX 75074.

6.    Biosonics is the true and correct owner of the Asserted Patents and holds all rights necessary to bring this action.

7.    On information and belief, Defendant SEC is a corporation organized under the laws of the Republic of Korea, with a principal place of business at 129, Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, Korea 443-742.

8.    On information and belief, Defendant SEA is a wholly owned subsidiary of SEC and a limited liability company organized under the laws of New York, with a principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

9.    On information and belief, Defendant SEC owns one hundred percent (100%) of SEA.

10.    On information and belief, SEA imports into the United States and sells in the United States, including in this District, mobile devices.

11.    The Asserted Patents are infringed through various Samsung mobile devices. Defendants SEC and SEA are related entities that work in concert to design, manufacture, import, distribute, and/or sell those infringing devices.

12.     Joinder is proper under 35 U.S.C. § 299. The allegations of infringement contained herein are asserted against the Defendants jointly, severally, or in the alternative and arise, at least in part, out of the same series of transactions or occurrences relating to Defendants' manufacture, use, sale, offer for sale, and importation of the same Accused Products (defined below).

13.     On information and belief, Defendants are part of the same corporate family of companies, and the infringement allegations arise at least in part from Defendants' collective activities with respect to Defendants' Accused Products. Questions of fact common to Defendants will arise in the action, including questions relating to the structure and operation of the Accused Products and Defendants' infringing acts.

## JURISDICTION AND VENUE

14.     This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. §271 *et seq*.

15.     This Court has jurisdiction on federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States..

16.     This Court has both general and specific jurisdiction over Defendants because Defendants have committed acts within this District giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, directly and through subsidiaries and intermediaries (including distributors, retailers, franchisees, and others), have committed acts of patent infringement in this District, by, among other things, making, using, testing, selling, licensing, importing and/or offering for sale/license products and services that infringe the Asserted Patents.

17.     The Court has personal jurisdiction over Defendants pursuant to due process and/or the Texas Long Arm Statute , by virtue of at least the substantial business each Defendant conducts

in this forum, directly and/or through intermediaries, including but not limited to:  (1) Defendants, directly or through intermediaries, have committed acts of patent infringement in this District and elsewhere in Texas which give rise to this action and having established minimum contacts with this forum such that the exercise of jurisdiction over each Defendant would not offend traditional notions of fair play and substantial justice; (2) Defendants have placed their products in the into the stream of commerce throughout the United States and regularly do business or solicit business in this District and in Texas, including through their wholly-owned subsidiary entities; (3) Defendants engage in other persistent courses of conduct and derive and/attempted to derive substantial revenue from products and/or services provided to individuals in this District and in Texas; (4) Defendants have purposefully established substantial, systematic, and continuous contacts with this District, including the physical location at 6625 Excellence Way, Plano, TX 75023, and should reasonably expect to be subject to suit in this District; and (5) Defendant SEA has been authorized to do business in the State of Texas by the Texas Secretary of State.

18.    Upon information and belief, Samsung's Plano facility operates as a major corporate center supporting several divisions. Samsung touts its Plano operations as a 216,000-square-foot flagship campus reflecting its "continued investment" in its "Texas roots." *See* https://news.samsung.com/us/samsung-electronics-america-open-flagship-north-texas-campus/. According to Samsung, "Samsung's move to Plano further demonstrates the company's dedication to Texas" and the Plano facility houses SEA's "second biggest employee population in the U.S. across multiple divisions – Customer Care, Mobile, Mobile R&D and Engineering." *Id*. "[M]ore than 1,000 regional employees" were relocated to work out of the Plano facility. *Id*.

19.     On information and belief, Samsung has also derived substantial revenues from infringing acts in the Eastern District of Texas, including from the sale and use of infringing products.

20.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b). With respect to SEA, venue is proper in this District under 28 U.S.C. §1400(b) because SEA has a regular and established place of business in this District and has committed acts of infringement in this District. On information and belief, SEA's business operations relating to mobile devices, like cell phones, which are devices accused of infringement in this action, are conducted at its Texas facility located within the Eastern District of Texas located at 6625 Excellence Way, Plano, Texas 75023. SEA also employs full-time personnel, such as engineers and senior managers in this District. On information and belief, Samsung's business operations relating to mobile devices are conducted at the SEA facility located in this District. SEA has also committed acts of infringement in this District by commercializing, marketing, selling, distributing, and servicing certain Samsung-branded devices, including but not limited to cell phones, which are devices Biosonics accuses of infringement in this action. SEA has designated CT Corporation System, with an address listed in Texas at 1999 Bryan St., Ste. 900, Dallas, TX 75201, as its representative to accept service of process within the State of Texas.

21.     With respect to SEC, a Korean company, venue is proper because suits against foreign entitles are proper in any judicial district within the United States.

22.     In other patent infringement matters involving Samsung's mobile devices, such as *Ericsson Inc., v. Samsung Electronics Co., Ltd. et al.*, Samsung has admitted that for patent infringement actions involving mobile devices, venue is proper in this District and that this Court may exercise personal jurisdiction over both SEC and SEA. *See Ericsson Inc., v. Samsung*

*Electronics Co., Ltd. et al.*, No. 2:21-cv-00010-JRG, Defendants' Answer and Counterclaims at ¶¶ 7-8, Dkt. No. 7 (EDTX Feb. 4, 2021); *see also Clear Imaging Research, LLC v. Samsung Electronics Co., Ltd. et al.*, No. 2:19-cv-326, Samsung Defendants' Answer at ¶¶ 7-8, Dkt. No. 23 (EDTX Jan. 22, 2020); *R2 Solutions LLC v. Samsung Electronics America, Inc.*, No. 4:21-cv-00089, Defendant Samsung Electronics America, Inc.'s Answer at ¶¶ 5-8, Dkt. No 14 (Apr. 19, 2021).

23.    Defendants have committed tortious acts within Texas and this District, and the causes of action set forth in this Complaint arise from those acts. Defendants developed, manufactured, imported, distributed, and sold mobile telephone and computing products that infringed the Asserted Patents, which have been imported, offered for sale, sold (directly or through Defendants' online store and distribution network), purchased, and used in Texas and within this District. Defendants also placed infringing products within the stream of commerce, with the knowledge and/or understanding that such infringing products would be sold and/or used in the United States, Texas and in this District.

## THE ASSERTED PATENTS

24.    On February 28, 2023, United States Patent No. 11,593,776, entitled "Communication Device to Sense One or More Biometric Characteristics of a User" ("the '776 Patent") issued. Biosonics is the owner by assignment of the entire right, title, and interest in and to the '776 Patent.  A true and correct copy of the '776 Patent along with a true and correct copy of the Certificate of Correction for the '776 Patent dated February 28, 2023 is attached as **Exhibit A**.

25.    On May 27, 2025, United States Patent No. 12,314,915, entitled "Communication Device To Sense One or More Biometric Characteristics of a User" ("the '915 Patent") issued.

Biosonics is the owner by assignment of the entire right, title, and interest in and to the '915 Patent. A true and correct copy of the '915 Patent is attached as **Exhibit B**.

26.    On June 23, 2015, United States Patent No. 9,065,893, entitled "Credit Card Form Factor Secure Mobile Computer and Method" ("the '893 Patent") issued. Biosonics is the owner by assignment of the entire right, title, and interest in and to the '893 Patent.  A true and correct copy of the '893 Patent is attached as **Exhibit C**.

27.    On September 1, 2015, United States Patent No. 9,122,966, entitled "Communication Device" ("the '966 Patent") issued. Biosonics is the owner by assignment of the entire right, title, and interest in and to the '966 Patent.  A true and correct copy of the '966 Patent is attached as **Exhibit D**.

## **FACTUAL BACKGROUND**

28.    Biosonics was founded by Dr. Donald Bitting and Lawrence F. Glaser with a focus on mobile device user authentication. Dr. Bitting has degrees in Physics, Computer Science, Materials Science and Mathematics, well as a Ph.D. in Materials Science and Engineering, and has spent his career as a technology licensing executive. Mr. Glaser is a visionary entrepreneur and inventor with a distinguished career spanning business management, telecommunications, marketing, and intellectual property development. In 1979, Glaser co-founded S & G Telephone Repair. By 1982, the company evolved into Fortran Corp., a firm that experienced exponential growth between 1985 and 2000, generating significant annual revenue. Mr. Glaser's ingenuity led to the creation of Siteman, a groundbreaking technology later licensed by Fujitsu and marketed as Net Prophet USA. More recently, Mr. Glaser's research and development on mobile payment systems over a period of many years resulted in significant and valuable technologies in biometric payment systems, among other things, which are protected by the Asserted Patents.

29.     Biosonics' patents generally relate to in-display fingerprint reading technology. This patented technology uses ultrasonic waves (or an under-the-display imaging sensor) to read fingerprints through the screen. Specifically, when a user presses their finger on the designated on-screen area, an ultrasonic sensor transmits sound waves through the display and reads the echo patterns as they bounce off the fingerprint's ridges and valleys. Alternatively, light-emitting pixels transmits light that is reflected off the user's finger and an image sensor reads the image of the fingerprint through the screen. In either variation, Biosonics' patented technology employs a unique process that allows the mobile device to create a detailed fingerprint map without a separate visible sensor.

30.     This technology is important for multiple reasons. First, it enables modern phones to maintain sleek, nearly bezel-free fronts while still offering convenient front-facing fingerprint unlock. Second, it preserves screen real estate because there is no need for a physical button or sensor outside of the screen area. Third, the ultrasonic method offers greater reliability across conditions. It isn't affected by ambient light, moisture, or grime the way optical sensors can be (optical scanners may struggle or produce glare in bright sunlight). Fourth, security is enhanced by in-display fingerprint reading this creates detailed fingerprint maps, reducing the risk of unauthorized access to devices compared to traditional PINs or passwords. Fifth, by integrating the fingerprint sensor into the display, the technology eliminates the need for a separate physical sensor, offering a smoother, more intuitive interaction with devices like smartphones. Sixth, the technology has broad applications—beyond smartphones, this technology can be applied to tablets, laptops, wearables, and even smart home devices, enabling secure and convenient authentication across a range of products. In sum, in-display fingerprint technology is a sought-after feature in

premium devices, thus providing manufacturers adopting Biosonics' patented technology a competitive edge in the consumer electronics market.

31.    As Samsung itself explains, biometric authentication has become essential for secure yet convenient smartphone access:



Biometric authentication is a critical capability on smartphones today, especially for regulated industries and government agencies. Leveraging unique biometric identifiers to authenticate users provides a high level of protection for sensitive data, while mobile users enjoy a convenient unlock and sign-in experience. It's — literally — security at your fingertips.

There's been great interest and speculation about Samsung's new approach to the fingerprint technology on the new Galaxy S10 and Note10 devices. As was revealed earlier this year, Samsung has implemented a new ultrasonic sensor that images the user's fingerprint through the screen on the Galaxy S10, Galaxy S10+, Galaxy S10 5G, and Note10 devices. The smaller Galaxy S10e incorporates a capacitive fingerprint sensor into the power button on the device's right bezel.

https://insights.samsung.com/2019/10/21/ultrasonic-unlock-the-innovation-behind-samsungs-in-display-fingerprint-id/.

32.    Samsung further explains that "Users Prefer Fingerprint." *Id.* Samsung's decision to adopt the in-screen fingerprint ID technology on the new Galaxy devices was driven by "consumer research," which showed that "fingerprint is by far the most utilized biometric method

for unlocking Samsung phones." *Id.* Samsung also states that "most users prefer a fingerprint sensor that is centered on the front of the device, so they can conveniently reach it with their thumb." *Id.* But, in Samsung's words, "there's a catch." *Id.*

33.    The catch is "users also want a large display with the thinnest possible bezels," which required Samsung to move the fingerprint sensor below the screen, thereby infringing Biosonics' patents. *Id.* Indeed, instead of using "an optical fingerprint sensor" on certain devices, Samsung "implemented ultrasonic technology." *Id.* Like in the Biosonics' patents, the "ultrasonic wave is transmitted through the display, and the ultrasonic pulse captures the uniqueness of the fingerprint." *Id.* Samsung explains that there are "several advantages" to this infringing use of Biosonics' patented technology, including (i) "a higher recognition rate outdoors" and in "low temperature conditions" and (ii) counteracting "spoofing attempts using 2D replicas of a person's fingerprint." *Id.*

34.    As set forth below, having fallen behind its competitors, such as Vivo and Huawei who showcased an in-display fingerprint sensor in 2018, Samsung resorted to using Biosonics' patented technology to maximize the screen size of its mobile devices within a fixed footprint. For example, Samsung relies on Biosonics' patented technology to enable ultrasonic under-the-display biometric authentication on the Galaxy S10, S20, S21, S22, S23, S24, S25, as well as the optical under-the-display biometric authentication on the Galaxy S20FE, S21FE, S22FE, S23FE, S24FE, and S25FE. Samsung also relies on Biosonics' in-display fingerprint reader technology for its Note 20, Note 10, A35, A36, A42, A50, A51, A52, A53, A54, A56 and A71 phones, as well as its Tablets, such as the Tab S10, Tab S9, Tab S8, Tab S7, Tab S6, and Tab S5e, among others.

35.    Prior to the inventions disclosed in the Asserted Patents, solutions for secure communication and authentication in portable devices typically relied on traditional magnetic stripe cards and other forms of integrations with electronic devices.

36.    **Legacy Cards**: Magnetic cards, such as credit cards, debit cards, medical and insurance cards, drug payment cards, health care service cards, stored value cards, identification cards, and access entry cards, stored information in a magnetic stripe to fixed access readers (e.g., point-of-sale (POS) systems, ATMs, etc.). These cards enabled basic transactions and access control through physical swiping in legacy readers, which required mechanical insertion or movement to read the data. Also, conventional plastic cards with exposed magnetic stripes were sensitive to direct damage or magnetically induced damage, leading to reliability issues. Legacy swipe systems required physical movement during reading, which caused wear, inefficiency, and potential security vulnerabilities as authentication relied on things like manually checking IDs or passwords, which could be spoofed or stolen. Also, users were required to carry multiple devices (phones, badges, cards, etc.), and there was no unified, secure, portable form factor that could function as a card and a phone.

37.    **Legacy Virtual Cards**: In 2011, Google announced Google Wallet, a service that allowed users to make tap-to-pay purchases using virtual cards on their Samsung Nexus S 4G,[1] which is shown below.[2]

---

[1] https://www.nfcw.com/2011/05/26/37720/google-wallet-day-one-for-nfc/.

[2] https://www.gsmarena.com/samsung_google_nexus_s_4g-3884.php.



Google Wallet is designed to enable safe, secure payments. It requires users to set up a Google

Wallet PIN that must be entered before making a purchase to prevent unauthorized access and

payments."[3]

38.     **Biosonics' Patent Applications Filed Well Before First Samsung Phone with a**

**Fingerprint Sensor**: In 2013, the application leading to the asserted '893 Patent was filed. The

first Samsung phone to include a fingerprint sensor was the 2014 Samsung Galaxy S5,[4] which is

shown below.[5]

---

[3] https://www.nfcw.com/2011/05/26/37720/google-wallet-day-one-for-nfc/.

[4]     https://www.igadgetsworld.com/fingerprint-scanner-history-evolution-but-do-we-really-need-
that/.

[5] https://www.gsmarena.com/samsung_galaxy_s5-6033.php.



39.  **Consumers desires Bigger Displays, Causing Problems with Fingerprint Sensor Placement**: In 2017, Samsung launched the Galaxy S8, which had "a bigger display but keep[ing] its compact size…."[6] That model, shown below, introduced a rear-mounted capacitive fingerprint sensor placed next to the camera, i.e., not under the display.[7] The rear-mounted sensor was described by the market as unorthodox. Reports indicated that Samsung had been working on an in-display implementation with Synaptics, but no manufacturer had implemented such a design

---

[6]  https://news.samsung.com/my/in-depth-look-see-more-do-more-the-samsung-galaxy-s8-and-s8-infinity-display.

[7] https://www.gsmarena.com/samsung_galaxy_s8-8161.php.

at the time and Samsung's introduction of the rear-mounted sensor resulted from "frustrating results" because the in-display implementation was still in testing phase.[8]



Capacitive fingerprint sensor on the back of the phone

40.    This rear-mounted placement drew widespread criticism:

One of the most contested changes about the Galaxy S8 and S8+ was moving the fingerprint sensor to the back of the phone next to the camera, and the cascading effect it created in making the phones difficult to reliably unlock.[9]

[C]ompromises have been made in Samsung's pursuit of prettiness….The fingerprint sensor, while fast, is in an awkward spot next to the camera instead of in the middle, which makes it a stretch to reach. WIRED lost count of the number

---

[8]    https://www.phonearena.com/news/Why-a-rear-finger-scanner-on-the-Galaxy-S8-Samsung-ran-out-of-time-with-the-on-screen-tech-by-Synaptics_id91942#:~:text=If%20 you%2C%20like%20us%2C%20have,.%22%20There%20you%20have%20it.

[9] https://www.androidcentral.com/common-galaxy-s8-problems-and-how-fix-them.

of times we thought we were unlocking the phone, but were instead rubbing a finger over the camera lens.[10]

41.     **Samsung Releases Infringing Ultrasonic Devices**: Beginning with the infringing Samsung Galaxy S10 in 2019, Samsung moved the fingerprint reader under the display. Upon information and belief, this shift enabled smaller bezels and retained a front-side unlock method, eliminating the awkwardness of the S8's rear sensor while removing the physical button entirely thereby increasing the screen-to-body ratio. Upon information and belief, relocating the fingerprint reader from its high, off-center position next to the camera to a natural thumb position under the screen addressed complaints about reach and lens smudging. Upon information and belief, because the new under-display sensor had no exposed button or cutout, it also improved water resistance, dust protection, and contributed to a cleaner design. Upon information and belief, the more reliable in-display fingerprint sensor strengthened Samsung Pay/Wallet use cases, allowing users to depend on their phones for secure biometric payments instead of carrying extra cards. Upon information and belief, at the same time that Samsung released the infringing Galaxy S10, "all-screen" smartphone designs were becoming popular, so under-display biometrics complemented this design trend while preserving the quick, single-touch unlock experience users preferred over PIN entry.

42.     Samsung reaped significant benefits by moving the fingerprint sensor under the screen for the Galaxy S10, using ultrasonic technology. This allowed the company to offer a cutting-edge design, enhance security, and create a strong marketing advantage over competitors. By being one of the first major brands to launch an in-display ultrasonic sensor, Samsung showcased its technological leadership and distinguished the Galaxy S10 from rival flagships. At

---

[10] https://www.wired.com/story/samsung-galaxy-s8-review/.

the time, for example, Apple was using Face ID for biometric authentication on its premium iPhones. The Galaxy S10's novel fingerprint technology provided consumers a compelling, different option. Beyond this, the ultrasonic sensor was FIDO Alliance certified, offering a higher level of security suitable for mobile payments and other sensitive transactions. This helped Samsung promote its own Samsung Pay service.

43.    Samsung's introduction of the in-display sensor drew rave reviews when introduced to the market. *See* https://www.theverge.com/2019/2/20/18232113/samsung-galaxy-s10-plus-fingerprint-sensor-screen-reader-ultrasonic-protector. Reviews noted that introduction of Biosonics' patented technology into the S10 allowed Samsung to "combine the gorgeous all-display screen with a clean design on the rear and the convenience of fingerprint authentication on the front of the device." *Id*. Reviewers further noted that "Samsung has set everything right about in-display fingerprint readers with its S10 devices." *Id*. Yet another reviewer noted, shortly after the introduction of the in-display functionality, that "[i]n-screen fingerprint readers are a hot trend in phone design because they don't take up any room on the phone face, and require less groping around than a sensor embedded on the phone's power button or back casing." https://www.cnet.com/tech/mobile/galaxy-s10-has-ultrasonic-fingerprint-scanner-heres-why-you-should-care-explainer/.

44.    By building its products and related services on Biosonics' patented technologies, Samsung infringes directly, literally, and/or by the doctrine of equivalents, contributes to the infringement of and/or induces infringement of the Asserted Patents by making using, selling, offering for sale, and/or importing into the United States the Accused Products. This has caused, and continues to cause, substantial and irreparable harm to Biosonics.

## OVERVIEW OF THE PATENTED TECHNOLOGY

45.    Years before Samsung released its infringing under-screen fingerprint sensor, Biosonics' inventor, Lawrence F. Glaser, filed an application, which resulted in the Asserted Patents. Mr. Glaser recognized that one solution to improving security for screen-based devices for mobile payments was to rely on biometric authentication. The problem with that solution was portable electronic devices, like cellular phones, historically located fingerprint sensors on bezels, buttons, or chassis surfaces adjacent to the display. Therefore, he also recognized that such arrangements consumed valuable surface area thereby constraining the display size within a fixed footprint.

46.    At the time of the invention, mobile or tap-to-pay technology was new, so users continued to carry separate cards, e.g., payment cards, access badges, etc. Also, since tap-to-pay was protected by an insecure PIN at that time, on-device authentication was not sufficiently seamless or secure across transaction contexts. Thus, Mr. Glaser recognized there were a multitude of needs, including the need to increase usable screen real estate without enlarging the device, to consolidate everyday transactions into a single device so that users could carry fewer physical items, and to make information associated with those transactions more secure. '776 Patent at 10:19-22 (the mobile device "can emulate plural hard cards a user may carry, front and back, first through scanning face to face, then, by way of the display."); 46:48-47:2 (employing hard and soft biometric login processes with automated lockout upon loss or failed access attempts); 82:62-67 (the device "provides a capability to create identity and security feedback loops…. For example, the feedback may involve a number of integrations, encryption, security, forensics, and the fingerprint or other biometrics of the authorized user may be checked against state and other records for each transaction"); 100:60-101:12 (The applicant envisions that the technology embodied in the mobile device can extend to other device forms, such as smartphones and tablets,

using the same layered and pixel configurations described (e.g., FIGS. 7B and 8B). This would ensure user authentication and promote user convenience.); 101:36-44("The portability of [mobile device] allows a user to perform a wide range of activities…For example, a user can carry, easily pocket, or otherwise secure a [mobile device] according to the present disclosure while performing any of numerous physical activities ( e.g., jogging/running/walking, biking, touring etc.), and thus have at the ready all the functionality of" the mobile device.).

47.    Figure 6 of the Asserted Patents shows a communication device configured to sense one or more biometric characteristics of a user, such as a fingerprint.



FIG.6

*Id.* at Fig. 6 (schematic view of card 100 with substrate 170 having processor 110, power supply 112, including a battery 180, power management device 182, memory 114, and communication unit 118).

48.    Figures 7A and 7B show more details of card 100. For example, Figure 7A shows a plan view of a portion of a major surface 101 of the Card.



*Id.* at Fig. 7A (showing various pixel stacks 98 on a surface 101 of the card 100). The pixel stacks 98 include a light emitting layer 198a comprised of LEDs 193. Turning to Figure 7B, which is a cross-sectional view of Figure 7A taken along lines 7B-7B, the card includes an intermixed array 106 a provided in respective multilayer stack S1 on the top of substrate 170.



*Id.* at Fig. 7B. Multilayer stack S1 includes, starting from the layer closest to substrate 170 and extending "vertically" away from substrate 170 in the "z" direction, light detecting layer 186 a, a piezoelectric-in pixel layer or a piezoelectric-in layer 194 a, a piezoelectric-out pixel layer or a piezoelectric-out layer 196 a, and a light emitting pixel layer or a light emitting layer 198 a. Light emitting layer 198 includes a plurality of LED's 193 as a light source. Light detecting layer 186 a includes an array of light receiving/detecting pixels of light sensitive material. It may be a CCD or another technology, such as CMOS. The pixels of piezoelectric-in layer 194 a can be configured to sense biometric data.

49.    Thus, by way of example, the '776 Patent relates to a communication device configured to sense one or more biometric characteristics of a user, such as fingerprints, using biometric pixel elements under a display. *See, e.g.*, claim 1. More specifically, it relates to a communication device configured to sense one or more biometric characteristics of a user, such as a mobile phone that senses a fingerprint of a user. *Id.* The communication device includes a cover structure including an exterior surface, such as the glass on the outside of the front face of a mobile phone. *Id.* It also includes a layer of display light-emitting output pixel elements positioned below the exterior surface to display images through the exterior surface, such as an OLED screen on a mobile phone. *Id.* The communication device also includes a plurality of biometric output pixel elements configured to provide an output in a direction through the exterior surface toward the user, for example, an ultrasonic fingerprint sensor comprised of piezoelectric-out pixel elements, or light emitting pixel elements that project light towards a user's finger. *Id.* The communication device also includes a plurality of biometric input pixel elements positioned below the exterior surface and device's screen. *Id.* For example, an ultrasonic fingerprint sensor comprised of piezoelectric-in pixel elements, or an image sensor comprised of light detecting pixel elements. Regardless, the biometric input pixel elements are configured to receive a reflected biometric input passing from the user through the exterior surface, e.g., a soundwave or a lightwave reflected from the user through the glass towards the biometric input sensor. *Id.* The communication device also includes a processor connected to the biometric input pixel elements to process the reflected biometric input, for example, to authenticate the user. The other Asserted Patents include similar features. *Id.*

50.    A person of ordinary skill in the art reviewing the specification of the Asserted Patents would understand that the inventors had possession of the claimed subject matter and would know how to practice the claimed invention without undue experimentation.

51.    The Asserted Patents therefore disclose innovative solutions for overcoming the very limitations exemplified by devices such as the Samsung Galaxy S8. In particular, the claimed inventions describe a communication device that integrates biometric sensing directly within the display structure. For example, Fig. 7B shows an exemplary patented pixel stacking technology. By embedding the biometric sensor *beneath the display pixels themselves*, the Asserted Patents eliminate the need for a separate rear-mounted or side-mounted sensor, thereby avoiding the ergonomic awkwardness, reach difficulties, and camera smudging issues associated with the rear-mounted fingerprint placement while also providing unrivaled biometric security.

52.    At the same time, the Asserted Patents' integrated display-based sensor design removes the requirement for any physical button, bezel, or cutout, allowing for a larger active screen area and a higher screen-to-body ratio, which directly addresses the aesthetic and usability motivations that led Samsung to move the sensor under the display in the Galaxy S10. Because the patented configuration combines display and biometric input/output within a single, sealed structure, it also inherently improves water resistance, dust protection, and mechanical durability compared to designs with exposed buttons or sensors. *See, e.g.*, '776 Patent at 18:4-8. Furthermore, by enabling accurate, front-side biometric authentication without compromising the display's form factor, the invention supports secure mobile payment applications such as Samsung Pay or Wallet, while maintaining the quick, single-touch convenience users expect, without the reliability and placement tradeoffs of prior solutions. *Id.* at 52:17-37; 83:55-58 (the mobile device "may require a valid fingerprint…to permit a transaction to proceed…").

**SAMSUNG'S INFRINGING PRODUCTS AND ACTIVITIES**

53.     Samsung has primarily reserved ultrasonic in-display ultrasonic fingerprint sensors for its infringing flagship S-series and Note-series smartphones, starting with the Galaxy S10 in 2019. Samsung also sells lower priced infringing "Fan Edition" devices with an in-display fingerprint imaging sensor (i.e., without an ultrasonic sensor). All Samsung smartphones and tablets incorporating in-display fingerprint sensors (e.g., ultrasonic or optical) are collectively referred to as the "Accused Products." Examples of the Accused Products are listed below:

### Phones with an in-display fingerprint reader:

- S25 FE, S25, S25+, and S25 Ultra
- S24 FE, S24, S24+, and S24 Ultra
- S23 FE, S23, S23+, and S23 Ultra
- S22, S22+, and S22 Ultra
- S21 FE 5G, S21 5G, S21+ 5G, and S21 Ultra 5G
- S20 FE 5G, S20 5G, S20+ 5G, and S20 Ultra 5G
- S10, S10+, and S10 5G
- Note20 5G and Note20 Ultra 5G
- Note10, Note10+, and Note10+ 5G
- A35 5G, A36 5G, A42 5G, A50, A51 5G, A52 5G, A53 5G, A54 5G, A56 5G and A71

### Tablets with an in-display fingerprint reader:

- Tab S5e
- Tab S6, and Tab S6 lite
- Tab S7+ and Tab S7 FE
- Tab S8+ and Tab S8 Ultra
- Tab S9, Tab S9+, and Tab S9 Ultra
- Tab S10 Lite, Tab S10+ and Tab S10 Ultra
- Tab S11 and Tab S11 Ultra

https://www.samsung.com/us/support/answer/ANS10001613/; *see also*
https://www.samsung.com/ae/support/mobile-devices/set-up-and-use-the-fingerprint-sensor-on-your-galaxy-phone/.  Biosonics reserves the right to discover and pursue any additional infringing devices that incorporate infringing technology. For avoidance of doubt, the Accused Products are identified to describe Samsung's infringement and in no way limits the discovery and infringement allegations against Samsung concerning any other devices that incorporate the same or reasonably similar technology.

49.     Upon information and belief, an ultrasonic fingerprint reader is superior to an optical in-display sensor. Specifically, the ultrasonic fingerprint reader acts to create a 3D image by reflecting a sonic pulse wave off the fingertip. This is more reliable than an optical in-display sensor, where a high-quality picture or fingertip scan can (and has) fool it. The ultrasonic fingerprint sensor uses an ultrasonic pulse which produces an extremely accurate 3D fingerprint replication where conventional fingerprint scanners use photographic sensors that produce 2D fingerprint scans. Indeed, upon information and belief, Samsung's ultrasonic fingerprint sensors transmit an ultrasonic pulse against the finger and use the reflected sound waves to read a finger's valleys and ridges. Of course, other Accused Products, such as the Samsung Galaxy S20 FE utilizes a behind the screen optical fingerprint sensor.

50.     Upon information and belief, Samsung has had knowledge and notice of the Asserted Patents, and its infringement thereof, since the patents issued. Upon information and belief Samsung, as a technology company, regularly monitors in-screen biometric technology advances, and it monitored or was otherwise aware of Plaintiff's patented inventions, especially due to their impact on Samsung's plans for its own technology and consumer electronics business.

54.     Alternatively, upon information and belief, Samsung had knowledge of certain patent family members related to the Asserted Patents no later than 2015–2018, by virtue of its disclosure during the prosecution of Samsung patent applications. As a result, Samsung was or should have been aware of the Asserted Patents upon their subsequent issuance due to its prior familiarity with the relevance of the patent family and, upon information and belief, internal policies requiring identification and disclosure of related or relevant patents.

55.     Alternatively, upon information and belief, Samsung learned of the Asserted Patents in existence through 2024 reach outs through different sources seeking to gauge potential Samsung interest in licensing.

56.     Despite having knowledge of the Asserted Patents prior to the filing of this Complaint, upon information and belief, Samsung has never undertaken any serious investigation to form a good faith belief as to non-infringement or invalidity of the Asserted Patents. Instead, Samsung has continued to infringe one or more claims of the Asserted Patents.

57.     Alternatively, to the extent that Samsung avoided or otherwise lacked actual knowledge of the Asserted Patents and its infringement thereof, it was willfully blind. Upon information and belief, to the extent it lacked actual knowledge of infringement, prior to the filling of this action, Samsung deliberately avoided learning of infringement, despite subjectively believing that there was a high probability that it infringed Plaintiff's patents, and specifically the Asserted Patents, and was therefore willfully blind. Upon information and belief, Samsung lacks written policies disseminated to employees regarding monitoring or avoidance of patent infringement by Samsung and lacks mechanisms for employees to report patents which they believe Samsung may infringe. Upon information and belief, Samsung and its

employees subjectively understood that there was a high likelihood that patents filed on innovations by Plaintiff read on the Accused Products.

58.    At least as of the commencement of this action, Samsung has both actual knowledge and notice of the Asserted Patents, and it continues to willfully infringe the Asserted Patents. By time of trial, Samsung will thus have known and intended that its continued actions would directly infringe and/or actively induce or contribute to the actual infringement of the Asserted Patents, including at least Claim 1 of each Asserted Patent.

59.    Samsung undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the Asserted Patents, which have been dully issued by the USPTO, and are presumed valid.

60.    Therefore, upon information and belief, Samsung's infringement of the Asserted Patents has been and continues to be willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate, entitling Biosonics to increased damages pursuant to 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

### COUNT I – INFRINGEMENT OF U.S. PATENT NO. 11,593,776

61.    Biosonics incorporates by reference and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

62.    Biosonics has not licensed or otherwise authorized Samsung to make, use, offer for sale, sell, or import any products that embody the inventions of the '776 Patent.

63.    Samsung has been and is now directly infringing and/or indirectly infringing the '776 Patent by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, including by making, using, selling, and/or

offering for sale in the United States or importing into the United States infringing products, including at least the Accused Products. Samsung derives revenue from the activities relating to the Accused Products. As explained below, these products are covered by one or more claims of the '776 Patent, including but not limited to claim 1.

64.    For example, claim 1 of the '776 Patent is reproduced below:

1.  A communication device configured to sense one or more biometric characteristics of a user, comprising:

a cover structure including an exterior surface;

a layer of display light emitting output pixel elements positioned below the exterior surface to display images through the exterior surface;

a plurality of biometric output pixel elements configured to provide an output in a direction through the exterior surface toward the user, the plurality of biometric output pixel elements positioned below the exterior surface and overlapping with the display light emitting output pixel elements in a direction perpendicular to the exterior surface, the plurality of biometric output pixel elements being at least one of light emitting pixel elements and piezoelectric-out pixel elements;

a plurality of biometric input pixel elements positioned below the exterior surface and overlapping with the display light emitting output pixel elements and the plurality of biometric output pixel elements in a direction perpendicular to the exterior surface, the plurality of biometric input pixel elements being at least one of light detecting pixel elements and piezoelectric-in pixel elements, and at least a portion of the plurality of biometric input pixel elements positioned and configured to receive a reflected biometric input passing from the user through the exterior surface; and

a processor connected to the biometric input pixel elements to process the reflected biometric input.

65.    The Accused Products directly infringe these features as shown in **Exhibits E (ultrasonic) and F (optical sensor).**

66.    Samsung also indirectly infringes claims of the '776 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States. For example, Samsung's customers and end users directly infringe through their use of the inventions claimed in the '776 Patent. Samsung

induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products and related services, and providing instructions, documentation, online technical support, marketing, product manuals, advertisements, and other information to customers and end users suggesting they use the Accused Products and related services in an infringing manner. For example, Samsung provides instructions on how to use its in-display fingerprint sensors. *See, e.g.*, https://www.samsung.com/us/support/answer/ANS10001613/. As a result of Samsung's inducement, Samsung's customers and end users use the Accused Products and related services in the way Samsung intends and directly infringe the '776 Patent. For example, Defendants' website provided, and continues to provide, instructions for using the Accused Products in a manner that results in infringement of the '776 Patent. Defendants do so knowing and intending that their customers and end users will commit these infringing acts. Defendants also continue to make, use, offer for sale, import and sell the Accused Products, despite their knowledge of the '776 Patent, thereby specifically intending for and inducing customers to infringe the '776 Patent through their normal and customary use of the Accused Products. Defendants also knew or were willfully blind that their actions would induce infringement by others and intended that their actions would induce infringement by others. Accordingly, a reasonable inference is that Defendants specifically intended for others to directly infringe one or more claims of Biosonics' '776 Patent in the United States because Defendants had knowledge of the '776 Patent and actively induced others (e.g. its customers) to directly infringe the '776 Patent.

67.    Samsung has also indirectly infringed under 35 U.S.C. § 271(c), by among other things, contributing to the direct infringement of others, including customers  and end users of the Accused Products, by making, using, offering for sale, importing and selling a component of a

patented machine, manufacture, or combination, or an apparatus for use in a practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in the infringement of the '776 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the Accused Products include hardware components for the infringing in-display fingerprint authentication. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. These components are a material part of the invention and, upon information and belief, are not a staple article of commerce suitable for substantial non-infringing use.

68.     As alleged above, Defendants had prior knowledge of the '776 Patent at least as early as the filing date of this Complaint and knew, should have known, or were willfully blind to the fact of Defendants' infringement of the '776 Patent at least as early as the filing of this Complaint.

69.     The Accused Products satisfy all claim limitations of at least claim 1 of the '776 Patent.

70.     Upon information and belief, Defendants derive revenue, directly and indirectly, from activities relating to the Accused Products and by infringing the '776 Patent, in this District and elsewhere.

71.     Biosonics has suffered damages as a result of Defendants' direct and indirect infringement of the '776 Patent at an amount to be proved at trial.

72.     The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '776 Patent, and therefore Biosonics has satisfied its obligations under 35 U.S.C. § 287 with respect to the '776 Patent.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 12,314,915

73.    Biosonics incorporates by reference and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

74.    Biosonics has not licensed or otherwise authorized Samsung to make, use, offer for sale, sell, or import any products that embody the inventions of the '915 Patent.

75.    Samsung has been and is now directly infringing and/or indirectly infringing the '916 Patent by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, including by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products, including at least the Accused Products. Samsung derives revenue from the activities relating to the Accused Products. As explained below, these products are covered by one or more claims of the '915 Patent, including but not limited to claim 1.

76.    For example, claim 1 of the '915 Patent is reproduced below:

1. A communication device configured to sense one or more biometric characteristics of a user, comprising:

a cover structure including an exterior surface;

a layer of display light emitting output pixel elements positioned below the exterior surface to display images through the exterior surface;

a plurality of output pixel elements configured to provide an output in a direction through the layer of display light emitting output pixel elements and through the exterior surface toward, and to be reflected from, the user, the plurality of output pixel elements positioned below the exterior surface and overlapping with the display light emitting output pixel elements in a direction perpendicular to the exterior surface, the plurality of output pixel elements being at least one of light emitting pixel elements and piezoelectric-out pixel elements; and

a plurality of biometric input pixel elements positioned below the exterior surface and overlapping with the display light emitting output pixel elements and the plurality of output pixel elements in the direction perpendicular to the exterior surface, the plurality of biometric input pixel elements being at least one of light

detecting pixel elements and piezoelectric-in pixel elements, and at least a portion of the plurality of biometric input pixel elements positioned and configured to receive the output reflected from the user as an input, the output reflected from the user being transmitted through the exterior surface and through the layer of display light emitting output pixel elements.

77.    The Accused Products directly infringe these features as shown in **Exhibits G (ultrasonic) and H (optical sensor)**.

78.    Samsung also indirectly infringes claims of the '915 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States. For example, Samsung's customers and end users directly infringe through their use of the inventions claimed in the '915 Patent. Samsung induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products and related services, and providing instructions, documentation, online technical support, marketing, product manuals, advertisements, and other information to customers and end users suggesting they use the Accused Products and related services in an infringing manner. For example, Samsung provides instructions on how to use its in-display fingerprint sensors.  *See, e.g.*, https://www.samsung.com/us/support/answer/ANS10001613/. As a result of Samsung's inducement, Samsung's customers and end users use the Accused Products and related services in the way Samsung intends and directly infringe the '915 Patent. For example, Defendants' website provided, and continues to provide, instructions for using the Accused Products in a manner that results in infringement of the '915 Patent. Defendants do so knowing and intending that their customers and end users will commit these infringing acts. Defendants also continue to make, use, offer for sale, import and sell the Accused Products, despite their knowledge of the '915 Patent, thereby specifically intending for and inducing customers to infringe the '915 Patent through their normal and customary use of the

Accused Products. Defendants also knew or were willfully blind that their actions would induce infringement by others and intended that their actions would induce infringement by others. Accordingly, a reasonable inference is that Defendants specifically intended for others to directly infringe one or more claims of Biosonics' ''915 Patent in the United States because Defendants had knowledge of the '915 Patent and actively induced others (e.g. its customers) to directly infringe the '915 Patent.

79.     Samsung has also indirectly infringed under 35 U.S.C. § 271(c), by among other things, contributing to the direct infringement of others, including customers  and end users of the Accused Products, by making, using, offering for sale, importing and selling a component of a patented machine, manufacture, or combination, or an apparatus for use in a practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in the infringement of the '915 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the Accused Products include hardware components for the infringing in-display fingerprint authentication. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. These components are a material part of the invention and, upon information and belief, are not a staple article of commerce suitable for substantial non-infringing use.

80.     As alleged above, Defendants had prior knowledge of the '915 Patent at least as early as the filing date of this Complaint and knew, should have known, or were willfully blind to the fact of Defendants' infringement of the '915 Patent at least as early as the filing of this Complaint.

81.     The Accused Products satisfy all claim limitations of at least claim 1 of the '915 Patent.

82.    Upon information and belief, Defendants derive revenue, directly and indirectly, from activities relating to the Accused Products and by infringing the '915 Patent, in this District and elsewhere.

83.    Biosonics has suffered damages as a result of Defendants' direct and indirect infringement of the '915 Patent at an amount to be proved at trial.

84.    The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '915 Patent, and therefore Biosonics has satisfied its obligations under 35 U.S.C. § 287 with respect to the '915 Patent.

**COUNT III – INFRINGEMENT OF U.S. PATENT NO. 9,065,893**

85.    Biosonics incorporates by reference and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

86.    Biosonics has not licensed or otherwise authorized Samsung to make, use, offer for sale, sell, or import any products that embody the inventions of the '893 Patent.

87.    Samsung has been and is now directly infringing and/or indirectly infringing the '893 Patent by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, including by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products, including at least the Accused Products. Samsung derives revenue from the activities relating to the Accused Products. As explained below, these products are covered by one or more claims of the '893 Patent, including but not limited to claim 1.

88.    For example, claim 1 of the '893 Patent is reproduced below:

1. A communication device, comprising:

a substrate having a first side and a second side; and

a multilayer stack positioned on the substrate, the multilayer stack including a plurality of pixel elements stacked in a direction perpendicular to the substrate, the plurality of pixel elements including at least one pixel element configured to provide an output in a direction away from the first side of the substrate, and at least one pixel element configured to receive an input passing entirely through at least one layer of the multilayer stack.

89.    The Accused Products directly infringe these features as shown in **Exhibits I (ultrasonic) and J (optical sensor)**.

90.    Samsung also indirectly infringes claims of the '893 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States. For example, Samsung's customers and end users directly infringe through their use of the inventions claimed in the '893 Patent. Samsung induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products and related services, and providing instructions, documentation, online technical support, marketing, product manuals, advertisements, and other information to customers and end users suggesting they use the Accused Products and related services in an infringing manner. For example, Samsung provides instructions on how to use its in-display fingerprint sensors. *See, e.g.*, https://www.samsung.com/us/support/answer/ANS10001613/. As a result of Samsung's inducement, Samsung's customers and end users use the Accused Products and related services in the way Samsung intends and directly infringe the '893 Patent. For example, Defendants' website provided, and continues to provide, instructions for using the Accused Products in a manner that results in infringement of the '893 Patent. Defendants do so knowing and intending that their customers and end users will commit these infringing acts. Defendants also continue to make, use, offer for sale, import and sell the Accused Products, despite their knowledge of the '893 Patent, thereby specifically intending for and inducing customers to infringe the '893 Patent through their normal and customary use of the

Accused Products. Defendants also knew or were willfully blind that their actions would induce infringement by others and intended that their actions would induce infringement by others. Accordingly, a reasonable inference is that Defendants specifically intended for others to directly infringe one or more claims of Biosonics' '893 Patent in the United States because Defendants had knowledge of the '893 Patent and actively induced others (e.g. its customers) to directly infringe the '893 Patent.

91.     Samsung has also indirectly infringed under 35 U.S.C. § 271(c), by among other things, contributing to the direct infringement of others, including customers and end users of the Accused Products, by making, using, offering for sale, importing and selling a component of a patented machine, manufacture, or combination, or an apparatus for use in a practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in the infringement of the '893 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the Accused Products include hardware components for the infringing in-display fingerprint authentication. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. These components are a material part of the invention and, upon information and belief, are not a staple article of commerce suitable for substantial non-infringing use.

92.     As alleged above, Defendants had prior knowledge of the '893 Patent at least as early as the filing date of this Complaint and knew, should have known, or were willfully blind to the fact of Defendants' infringement of the '893 Patent at least as early as the filing of this Complaint.

93.     The Accused Products satisfy all claim limitations of at least claim 1 of the '893 Patent.

94.     Upon information and belief, Defendants derive revenue, directly and indirectly, from activities relating to the Accused Products and by infringing the '893 Patent, in this District and elsewhere.

95.     Biosonics has suffered damages as a result of Defendants' direct and indirect infringement of the '893 Patent at an amount to be proved at trial.

96.     The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '893 Patent, and therefore Biosonics has satisfied its obligations under 35 U.S.C. § 287 with respect to the '893 Patent.

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 9,122,966

97.     Biosonics incorporates by reference and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

98.     Biosonics has not licensed or otherwise authorized Samsung to make, use, offer for sale, sell, or import any products that embody the inventions of the '966 Patent.

99.     Samsung has been and is now directly infringing and/or indirectly infringing the '916 Patent by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, including by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products, including at least the Accused Products. Samsung derives revenue from the activities relating to the Accused Products. As explained below, these products are covered by one or more claims of the '966 Patent, including but not limited to claim 1.

100.    For example, claim 1 of the '966 Patent is reproduced below:

1. A communication device, comprising:

a substrate having a first side and a second side; and

a plurality of pixel stacks positioned on the substrate, each pixel stack of the plurality of pixel stacks including a plurality of pixel elements overlapping in a direction perpendicular to the substrate, the plurality of pixel elements including at least one output pixel element configured to transmit an output through an exterior surface of the pixel stack in a direction away from the substrate, and at least one input pixel element configured to receive an input passing through the exterior surface and through the at least output one pixel element; and

a near field communication device positioned on the communication device.

101.    The Samsung Accused Products directly infringe these features as shown in **Exhibits K (ultrasonic) and L (optical sensor)**.

102.    Samsung also indirectly infringes claims of the '966 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States. For example, Samsung's customers and end users directly infringe through their use of the inventions claimed in the '966 Patent. Samsung induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products and related services, and providing instructions, documentation, online technical support, marketing, product manuals, advertisements, and other information to customers and end users suggesting they use the Accused Products and related services in an infringing manner. For example, Samsung provides instructions on how to use its in-display fingerprint sensors. *See, e.g.*, https://www.samsung.com/us/support/answer/ANS10001613/. As a result of Samsung's inducement, Samsung's customers and end users use the Accused Products and related services in the way Samsung intends and directly infringe the '966 Patent. For example, Defendants' website provided, and continues to provide, instructions for using the Accused Products in a manner that results in infringement of the '966 Patent. Defendants do so knowing and intending that their customers and end users will commit these infringing acts. Defendants also continue to make, use, offer for sale, import and sell the Accused Products, despite their knowledge of the '966 Patent, thereby specifically intending for

and inducing customers to infringe the '966 Patent through their normal and customary use of the Accused Products. Defendants also knew or were willfully blind that their actions would induce infringement by others and intended that their actions would induce infringement by others. Accordingly, a reasonable inference is that Defendants specifically intended for others to directly infringe one or more claims of Biosonics' '966 Patent in the United States because Defendants had knowledge of the '966 Patent and actively induced others (e.g. its customers) to directly infringe the '966 Patent.

103.    Samsung has also indirectly infringed under 35 U.S.C. § 271(c), by among other things, contributing to the direct infringement of others, including customers and end users of the Accused Products, by making, using, offering for sale, importing and selling a component of a patented machine, manufacture, or combination, or an apparatus for use in a practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in the infringement of the '966 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the Accused Products include hardware components for the infringing in-display fingerprint authentication. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. These components are a material part of the invention and, upon information and belief, are not a staple article of commerce suitable for substantial non-infringing use.

104.    As alleged above, Defendants had prior knowledge of the '966 Patent at least as early as the filing date of this Complaint and knew, should have known, or were willfully blind to the fact of Defendants' infringement of the '966 Patent at least as early as the filing of this Complaint.

105.    The Accused Products satisfy all claim limitations of at least claim 1 of the '966 Patent.

106.    Upon information and belief, Defendants derive revenue, directly and indirectly, from activities relating to the Accused Products and by infringing the '966 Patent, in this District and elsewhere.

107.    Biosonics has suffered damages as a result of Defendants' direct and indirect infringement of the '966 Patent at an amount to be proved at trial.

108.    The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '966 Patent, and therefore Biosonics has satisfied its obligations under 35 U.S.C. § 287 with respect to the '966 Patent.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Biosonics Technology, LLC moves this Honorable Court for judgment to be entered in its favor and against Defendants, Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc., and for the following relief:

(i)    A judgment in favor of Biosonics that Samsung has infringed, directly and indirectly, by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the '776 Patent;

(ii)    A judgment in favor of Biosonics that Samsung has infringed, directly and indirectly, by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the '915 Patent;

(iii)    A judgment in favor of Biosonics that Samsung has infringed, directly and indirectly, by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the '893 Patent;

(iv)    A judgment in favor of Biosonics that Samsung has infringed, directly and indirectly, by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the '966 Patent;

(v)    An award of damages to which Biosonics is entitled under 35 U.S.C. § 284  for Samsung's past infringement and any continuing or future infringement post-trial

up until the date a final judgment is entered, including both compensatory damages and enhanced damages for willful infringement;

(vi)  Biosonics' actual damages in an amount sufficient to compensate Biosonics for Samsung's infringement of the Asserted Patents until such time as Samsung ceases its infringing conduct, including supplemental damages post-verdict;

(vii)  A judgment and order against Samsung for exemplary damages as determined by the trier of fact;

(viii)  A judgment that Samsung's infringement has been willful;

(ix)  Pre- and post-judgment interest as allowed by law on any damages awarded to Biosonics;

(x)  A judgment and order requiring Samsung to pay the costs of this action (including all disbursements), as well as attorneys' fees as provided by 35 U.S.C. § 285;

(xi)  A judgment and order requiring Samsung to pay Biosonics compulsory ongoing licensing fees, as determined by the Court in equity; and

(xii)  Such other and further relief as this Court shall deem appropriate.

## DEMAND FOR JURY TRIAL

Biosonics demands a trial by jury of any and all issues triable of right before a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## RESERVATION OF RIGHTS

Plaintiff's investigation is ongoing, and certain material information remains in the sole possession of the Defendants or third parties, which will be obtained via discovery herein. Plaintiff expressly reserves the right to amend or supplement the causes of action set forth herein in accordance with Rule 15 of the Federal Rules of Civil Procedure.

DATED: October 28, 2025                     Respectfully submitted,


                                            */s/ Blair M. Jacobs by permission Claire Henry*
                                            Blair M. Jacobs (Lead Attorney)
                                            D.C. Bar No. 471024

bjacobs@bsfllp.com
Christina A. Ondrick
D.C. Bar No. 494625
condrick@bsfllp.com
John S. Holley
Texas Bar No. 24078678
jholley@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. N.W.
Washington D.C. 20005
Telephone: (202) 237-2727
Facsimile:  (202) 202 237 6131

Claire A. Henry
Texas Bar No. 24053063
Andrea L. Fair
Texas Bar No. 24078488
**Miller Fair Henry PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: (903) 757-6400
Fax: (903) 757-2323
claire@millerfairhenry.com
andrea@millerfairhenry.com

**ATTORNEYS FOR PLAINTIFF
BIOSONICS TECHNOLOGY, LLC**